**GULF OIL CORPORATION, Plaintiff,**

v.

**DEPARTMENT OF ENERGY et al., Defendants.**

Civ. A. No. 81–887.

United States District Court, District of Columbia.

May 14, 1981.

Gerald P. Thurmond, Ken M. Brown, Washington, D. C., for plaintiff; Robert F. Ochs, John R. Knight, Bradley Ford Stuebing, Houston, Tex., of counsel.

Thomas H. Kemp and Janet Richmond, Dept. of Energy, Washington, D. C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes, before the court on plaintiff-Gulf Oil Company's motion for a

preliminary injunction. A hearing on this motion was held April 29, and the court took the matter under advisement. For the reasons stated below, Gulf's motion will be denied.

### Introduction

In this action for declaratory and injunctive relief, Gulf challenges a Supplemental Order issued on March 6, 1981 (the "March 6 Order") by the defendant[1] Department of Energy (DOE). This March 6 Order modifies an earlier Interim Decision and Order, issued on December 31, 1980 (the "December 31 Decision"). Gulf claims that the March 6 Order is arbitrary and capricious, was based on assumptions which are unsupported in the record, deprives Gulf of property without due proces of law and without prior notice and opportunity to be heard, and was issued without statutory or regulatory authority. Because the potential harm of which Gulf complains will apparently become effective with the publication of an Entitlements Notice, originally due to be published in March, 1981 (the "March Entitlements Notice"), Gulf seeks a preliminary injunction enjoining DOE from issuing the March Entitlements Notice, or any other Entitlements Notice, or enjoining DOE from including the 341 Tract Unit of the Citronelle Field, Mobile County, Alabama (the "341 Unit"), as a buyer of entitlements on the March Entitlements Notice, or on any Entitlements Notice.

### Statutory and Regulatory Background

DOE administers several price control programs. One of these, the Old Oil Entitlements Program, was created to equalize access by all refiners to price-controlled old domestic crude oil. 39 Fed.Reg. 42246 (Dec. 4, 1974). Currently the program equalizes cost differences between price-controlled lower-tier (old) crude oil, and upper-tier (new) crude oil, and uncontrolled crude oil by requiring cash transfers between refiners. Refiners with greater access than the national average to price-controlled crude oil make cash payments, termed "entitlement purchases," to those refiners with relatively less access to price-controlled crude oil. This latter group of refiners is said to "sell entitlements."

Each month all refiners are required to report their crude oil receipts, by tier category, to the Economic Regulatory Administration (ERA), which computes the entitlements obligations for all refiners. These obligations appear on an "Entitlements Notice," published monthly, usually about 2 months after the month in which receipts are reported to ERA. Hence, refiners' receipts reported for January, 1981 (the last month prior to decontrol of crude oil) will be used by ERA to calculate the entitlements obligations appearing in the Entitlements Notice originally due to be published in March, 1981, but postponed.

DOE also administers the Tertiary Incentive Pricing Program (TIPP) under which a producer which has initiated a qualified enhanced recovery project on a property can sell, at free market prices, production that otherwise would be price controlled, and can recover "recoupable allowed expenses" incurred in the tertiary project.

Gulf buys about 98.1% of crude oil production from the "341 Unit" (the operator of a producing oil field in the Citronelle Field, Mobile County, Alabama). Gulf buys the 341 Unit's oil from Douglas Oil Producing Co., Inc., a crude oil reseller which purchases production directly from the 341 Unit.

The 341 Unit initiated a qualified tertiary enhanced recovery project at the Citronelle Field, after July 7, 1980, allowing the 341 Unit, under TIPP, to sell at free market prices production which would otherwise have been price controlled. The 341 Unit recertified prior production and invoiced Douglas for tertiary incentive revenue (the difference between the controlled price and

---

1. The defendants in this case are the Department of Energy, the Secretary of Energy, the Acting Administrator of the Economic Regulatory Administration, and the Director and Deputy Director of the Office of Hearings and Appeals. Both the Economic Regulatory Administration and the Office of Hearings and Appeals are part of the Department of Energy. All five defendants will be referred to herein as "defendant," or "DOE".

the uncontrolled, free market price). Douglas then invoiced Gulf for these amounts, and, in November and December, 1980, Gulf paid Douglas, which then paid to the 341 Unit, $599,768.29 in "tertiary incentive revenues," representing the difference between the upper tier controlled price, and the free market price charged pursuant to TIPP for 25,885.55 barrels of recertified crude oil produced by the 341 Unit in September, 1980. In August, 1979, the 341 Unit filed an Application for Exception with the Office of Hearings and Appeals (OHA), seeking exception relief from DOE's pricing provisions to provide the 341 Unit with money to fund the tertiary recovery project. The OHA's December 31, 1980 Decision granted exception relief, under a plan by which the Unit would receive over $60 million for the tertiary recovery project. This December 31 Decision required Gulf to sell entitlements to participants in the Old Oil Entitlements Program, in an amount equal to the monetary relief the December 31 Decision awarded to the 341 Unit. Gulf then paid the proceeds of the entitlements sale to the 341 Unit.

Under Ordering Paragraph 9 of the December 31 Decision's award of exception relief, the 341 Unit was required to waive access to any of the upper-tier certification provisions of TIPP; any revenues received by the 341 Unit through the tertiary incentive program were to be returned to crude oil purchasers within 60 days, with interest. Thus, the December 31 Decision required the 341 Unit to repay to Gulf $599,768.29 in tertiary incentive revenues previously received from Gulf, with interest, by March 2, 1981. The December 31 Decision further required that, upon receipt of repayment, Gulf was to recertify as upper-tier receipts in its reports to ERA, any barrels previously reported as tertiary free market receipts in conjunction with the tertiary free market payments made to the 341 Unit. According to Gulf, the effect of this last requirement of the December 31 Decision was to put Gulf in the same position it would have been in had the 341 Unit never recertified price-controlled production as tertiary incentive (price uncontrolled) production.

On March 2, 1981, the 341 Unit sought a brief extension of time for making repayment required by the December 31 Decision. Gulf did not object, and on March 5, 1981, DOE by letter granted an extension to March 9, 1981, for the 341 Unit to comply with Ordering Paragraph 9 of the December 31 Decision.

DOE subsequently issued the March 6 Order, which is the subject of this suit, which Gulf says was a reversal of DOE's position. The March 6 Order rescinded the provisions of Ordering Paragraph 9 of the December 31 Decision, and required the 341 Unit to use the $599,768.29 received from Gulf to purchase entitlements directly as a one-time participant in the Old Oil Entitlements Program. According to Gulf, the effect of the March 6 Order is to raise by several dollars per barrel Gulf's cost for the 25,885 barrels of oil recertified to Gulf by the 341 Unit as tertiary incentive crude oil.

This increase in cost will arise from the following analysis: The barrels against which the $599,768.29 tertiary incentive differential payment was matched were produced and sold in September 1980. Gulf received and paid for those barrels in October 1980, paying the upper-tier ceiling price of $14.83/barrel, or a total pre-entitlement purchase price of $383,437.80. Gulf reported these to the Economic Regulatory Administration (ERA), incurring entitlements purchase obligations of $471,736.65, for a total post-entitlement cost of the barrels, before tertiary recertification, of $855,174.45, or $33.04/barrel.

In November and December, 1980, Gulf paid Douglas Oil Co. $599,768.55 for the difference between the controlled price previously paid and the free market price for the barrels, raising the pre-entitlement price of the barrels to $56.21/barrel, for a total pre-entitlement cost of $1,454,943.00 ($855,174.45 + $599,768.55). Because of internal accounting difficulties, Gulf did not recertify the barrels as tertiary incentive production until March 5, 1981. Thus Gulf has not yet received entitlements credits

reflecting the fact that Gulf paid free market price for the oil, and Gulf has thus not been cost equalized through the entitlements program for the tertiary prices paid for the 341 Unit's oil.

Under the December 31 Order, Gulf would receive repayment of the full $599,768.55 paid as tertiary incentive prices, and Gulf would not recertify the barrels to ERA for purposes of entitlements credits. Gulf's post-entitlement cost for the 25,885 barrels of September 1980 production would continue to be the $33.04/barrel that existed before the 341 Unit was eligible for tertiary incentive pricing, which the 341 Unit subsequently waived in connection with the before mentioned exception proceeding.

Under the March 6 Order, the 341 Unit will use the $599,768.55 to purchase entitlements directly as a participant in the entitlements program. Because Gulf recertified the 25,885.55 barrels of crude oil as tertiary incentive production in its March 5 report to ERA, Gulf will receive a credit for the recertified barrels. The amount of the credit will depend on the value of an entitlement for the last month of the entitlements program, January 1981, because that is the month covered by the March 5 report. Gulf has estimated the value of the entitlements, and calculates that the credit it will receive for the 25,885.55 barrels will be $526,007.19. Gulf's post-entitlement crude cost for the 25,885.55 barrels will therefore be $35.89/barrel under the March 6 Order. This is derived as follows:

$$\frac{(\$1,454,943.00 \text{ [present total cost]} - \$526,007.19 \text{ [estimated entitlements]})}{25,885.55 \text{ barrels}}$$

Thus, Gulf's cost will increase by $2.85/barrel under the March 6 Order, for a total increase in cost of $74,000. Defendant has not attempted to dispute plaintiff's estimates.

### Power of the court to grant the requested relief

DOE raises a preliminary question of this court's power to issue the injunction Gulf seeks. Under section 211(d)(2) of the Economic Stabilization Act, 12 U.S.C. § 1904 note, this court "may enjoin temporarily or permanently the application of a particular regulation or order issued under this title to a person who is a party to litigation before it." DOE argues that the March 6 Order, and the Entitlements Notice that will carry out the terms of that Order, only apply to the 341 Unit, and not to Gulf. And because the 341 Unit is not a party to this suit, DOE argues that the requested injunction cannot issue. Gulf responds that the March 6 Order and the upcoming Entitlements Notice

will affect Gulf, and that they therefore apply to Gulf.

Even if the March 6 Order, and the Entitlements Notice do apply to Gulf, the question arises whether the absence of the 341 Unit from this case precludes the relief sought, to the extent that relief would affect the 341 Unit. This latter question is not solely a matter of determining the meaning of section 211(d)(2); it is also a question of constitutional limits on the power of this court to affect the rights and interests of those not before the court.[2]

There is little legislative history or case analysis illuminating the statutory interpretation question before the court. The scant legislative history indicates that the judicial review provisions, section 211 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, are designed to 1. provide speed and consistency of decision in cases arising under the Economic Stabilization Act; 2. avoid breaks or stays in the opera-

---

2. An attorney for the 341 Unit has stated in a letter of April 3, 1981, to the DOE, that the 341 Unit "has no objection to the request by Gulf that the requirement for repayment to Gulf of tertiary incentive revenues be reinstated." Exhibit G to Gulf's Motion for a Temporary Restraining Order. Whether this letter would serve to resolve the statutory and constitutional questions raised by Gulf's request for injunctive relief need not be determined now, because, as noted below, the standards for a preliminary injunction have not been satisfied.

tion of the stabilization program; and 3. provide relief for particular persons aggrieved by the operation of the program. Section 211(d)(2) is described as providing "relief for a particular person who may be aggrieved by the operation of this program during the period in which he is attempting to establish his legal position . . ." while "restrict[ing the injunctive power of the courts in cases under this Act] to the application of a particular regulation or order to a particular person who is a party to litigation before it." S.Rep.No. 92–507, 92nd Cong., 1st Sess. ——, *reprinted in* [1971] U.S.Code Cong. & Ad.News 2283, 2292–94. Relying on this legislative history, the District Court for the Western District of Pennsylvania stated, "the Congressional intent [embodied in section 211(d)(2) is] that general enforcement of the program would continue with respect to all persons other than the party litigants to obtain an interlocutory injunction." *U.S. v. Gulf Oil*, 408 F.Supp. 450, 462 (W.D.Pa.1975). Thus, it appears that Congress' intent was to restrict actions of federal courts so that they would not interfere with programs under the Act any more than absolutely necessary to provide relief for the person challenging the order. In a close case, such as this one, there is no guidance on which of the two policies (relief for an aggrieved person, and an unobstructed administration of the Act), is dominant.

The court need not now resolve the substantial questions of statutory interpretation and constitutional limits on the court's power, because the discussion below of the standards for issuing a preliminary injunction leads the court to conclude that preliminary injunctive relief would be inappropriate in this case. The court simply notes that, even were an injunction otherwise appropriate, there are substantial questions of the court's power to issue one.

*Standards for a preliminary injunction*

The parties are in agreement that *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958) establishes the standards for issuing a preliminary injunction in this circuit. Those standards are the following:

(1) Has the petitioner made a strong showing that it is likely to prevail on the merits . . . ? Without such a substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review. (2) Has the petitioner shown that without such relief, it will be irreparably injured? The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. But injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits. (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? On this side of the coin, we must determine whether, despite showings of probable success and irreparable injury on the part of petitioner, the issuance of a stay would have a serious adverse effect on other interested persons. Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents. (4) Where lies the public interest? In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor necessarily becomes crucial. The interests of private litigants must give way to the realization of public purposes.

*Irreparable Injury*

Gulf claims that if the March Entitlement Notice is published, implementing the March 6 Order, then Gulf will sustain a loss of approximately $75,000, which it will never be able to recover. This loss will be irretrievable, Gulf asserts, because the March Entitlements Notice is the last

scheduled notice to be issued under the Entitlements Program. Thus, Gulf asserts, there is no mechanism currently in existence by which Gulf could recover its losses or otherwise be made whole in the future. Gulf could not sue the DOE for money damages because of sovereign immunity; Gulf could not sue the 341 Unit, because the 341 Unit will not retain any of the funds at issue; the DOE would not have authority to order participants in the Entitlements Program to refund money to Gulf; this court will not have jurisdiction over other participants in the Entitlements Program, so the court could not order those participants to repay Gulf; and finally, a subsequent suit by Gulf against the participants in the Entitlements Program to recover the loss would be so costly, and so unlikely to succeed, that as a practical matter, Gulf would likely not pursue such suits.

In order to analyze Gulf's irreparable injury claim, it is necessary to break that claim down into its two parts. First, Gulf claims that it will suffer an irretrievable monetary loss. Second, Gulf argues that an irretrievable monetary loss can constitute irreparable injury. The court will treat the second point first.

The cases in this circuit have not squarely addressed the question of whether an irretrievable monetary loss, without more, can constitute irreparable injury. In the cases discussing the issue, the record revealed that more than just a sum of money was involved; rather, in most of the cases the monetary injury was sufficiently large in proportion to the plaintiff's operations that the loss of the amount of money involved would also cause extreme hardship to the business, or even threaten destruction of the business. For example, in *Art-Metal—USA, Inc. v. Solomon*, 473 F.Supp. 1 (D.D.C. 1978), the court noted that plaintiff had produced credible evidence "that absent an injunction, it will be put out of business." *Id.* at 4. The court stated, "The destruction of a business is irreparable harm sufficient to warrant the granting of interim relief. *Washington Metropolitan Area Transit Commission v. Holiday Tours,* . . . 559 F.2d 841 (D.C.Cir.1977). Art Metal has no ade-

quate remedy at law inasmuch as the damages it could obtain would be limited to its bid preparation costs. Thus, the irretrievable monetary loss is properly considered in determining irreparable injury. *Pan American World Airways v. Marshall,* . . . 439 F.Supp. [487] at 497 [(S.D.N.Y.1977)]." *Id.* [473 F.Supp.] at 4 n.4. And in *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir. 1977), the court noted that the ("harm to Holiday Tours in the absence of a stay would be its destruction in its current form as a provider of bus tours.") *Id.* at 843. The court stated, "The destruction of a business is, of course, an essentially economic injury. It is not, however, one of the 'mere' economic injuries which under *Virginia Petroleum Jobbers* are insufficient to warrant a stay. The economic injuries disparaged in that case were the necessary expenditure of funds pending appeal and the temporary monetary losses for which 'adequate compensatory or other corrective relief will be available at a later date.' 259 F.2d at 925." *Id.* 559 F.2d at 843 n.2. In *Hoffmann-Laroche, Inc. v. Califano*, 453 F.Supp. 900 (D.D.C.1978), the court stated that if a challenged order "goes into effect, plaintiff will suffer loss of sales and good will for which it would have no right of recourse, and thus its injury will be irreparable. The loss is admittedly economic, but since no 'adequate compensatory or other corrective relief will be available at a later date,' it is not one of the ' "mere" economic injuries which under *Virginia Petroleum Jobbers* are insufficient to warrant a stay.' " (Citations omitted.)

Gulf has cited *Jacksonville Port Authority v. Adams*, 556 F.2d 52 (D.C.Cir.1977) as support for its position that a solely monetary loss which might be rendered irretrievable by the expiration of a program satisfies the irreparable injury standard. However, no such lesson can be drawn from *Jacksonville* for at least two reasons. First, the injury in that case was not clearly just a loss of money. Rather, it appears that the loss of almost $300,000 dollars would likely threaten plaintiff's airport construc-

tion project. Second, the court in *Jacksonville* noted that plaintiff "presented a strong likelihood of success on the merits, given the prior decision by" the same District Court judge whose denial of the application for a temporary restraining order was on appeal in *Jacksonville*, invalidating the challenged government action. *Id.* at 58. As *Virginia Petroleum Jobbers, supra,* makes clear, "injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits." Thus, the court in *Jacksonville* applied a different standard of irreparable injury than may be appropriate in this case, inasmuch as the likelihood of Gulf's success on the merits in this case is not as great as was the plaintiff's likelihood of success in *Jacksonville*.

■ Thus, in every case cited by Gulf, there are two elements to irreparable injury; these are an irretrievable monetary loss, and resulting damage which cannot be estimated in terms of money, and cannot be redressed by money. In this case, only the former element is present. The court concludes that this is not enough. This is a close question, because there is some appeal to the proposition that any damage, however slight, which cannot be made whole at a later time, should justify injunctive relief. However, some concept of magnitude of injury is implicit in the *Virginia Petroleum* standards, under which, if plaintiff shows irreparable injury and likelihood of success on the merits, the court must then weigh against this the injury to defendant, and the public interest. While perhaps leading to some confusion, the courts appear to treat some threshold level of this balancing, *sub silentio,* under the irreparable injury prong of the analysis. The result of this balancing process appears to be that the injury must be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff. Under this standard, it is apparent that Gulf will not suffer irreparable harm even if the monetary loss is irretrievable.

■ The court need not rest its decision solely on this analysis, however, because the court concludes that Gulf has made an insufficient showing that any loss it may suffer will be irretrievable. On April 22, 1981, DOE issued a Notice of Intent, in which it affirmed its intention to establish a mechanism to make adjustments to entitlements obligations resulting from decisions of the Office of Hearings and Appeals, the Federal Energy Regulatory Commission, or court decisions. While Gulf argues that the possibility of relief by way of this "clean up" mechanism is remote, it does not so appear to the court. It is indeed likely, as Gulf asserts, that any such mechanism will be challenged in court, but this is not a sufficient basis for finding that no relief will be available later. The clean-up mechanism appears to be authorized by the same executive order which ended crude oil price controls. Executive Order 12287, January 28, 1981. Section three of that Order states, "The Secretary of Energy may, pursuant to Executive Order No. 11790 as amended by Executive Order No. 12038, adopt such regulations and take such actions as he deems necessary to implement this Order including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order". Of course, no court has yet decided whether the proposed clean-up regulations are authorized by this Executive Order. However, this lack of a judicial ruling upholding regulations which DOE intends to promulgate in the future does not change the fact that DOE intends to promulgate some kind of clean-up regulations which, like all regulations, will be valid until shown to be invalid. Indeed, Gulf has wholly failed to present any substantial arguments that the Executive Order does not authorize clean-up regulations, and it appears from the plain language of the Order that a clean-up regulation is authorized. Gulf argues that even a valid clean-up regulation could not correct the DOE's alleged error here, because the errors here are characterized as post-decontrol events, but the Order only authorizes, at most, clean-up

regulations to correct for pre-decontrol errors. Gulf's position too narrowly reads the Executive Order; that Order appears to authorize clean-up regulations which correct errors reflected in Entitlements Notices which covered periods prior to decontrol. Since the March Entitlements Notice covers a period prior to decontrol, any errors reflected in that notice would be correctable by the clean-up regulations, under this Executive Order.

Thus, without deciding whether any final clean-up regulations will be valid (because that question is not properly presented here) the court concludes that there is a strong likelihood that any injury Gulf may suffer from the March 6 Order and the March Entitlements Notice, will not be irretrievable, because of the likelihood that effective, valid clean-up regulations will be promulgated. There does not here exist "the uncertainty in the law concerning the effect of the expiration of [crude oil controls such as would] establish [ ] a substantial risk of irreparable harm looming with the passage of [crude oil controls]. *Jacksonville Port Authority, supra*, at 58.

*Likelihood of success on the merits*

■ Gulf has failed to show a sufficient likelihood of success on the merits to justify preliminary injunctive relief. Gulf has made several major arguments on the merits. First, Gulf argues that the March 6 Order was arbitrary and capricious. Even assuming that this correctly states the standard of review applicable to the March 6 Order, *see* section 211(d)(1), 12 U.S.C. § 1904 note, Gulf has not shown a likelihood of success on the question of whether the Order fails to pass muster under this standard. While it may be that DOE based its March 6 Order on an assumption of facts which did not exist, the assumption was entirely reasonable, given the incentives to Gulf, and to all crude oil purchasers, to report refinery receipts of market level oil to the entitlements program as soon as they were received, in accordance with 10 C.F.R. § 211.66(h). And given DOE's intent to promulgate clean-up regulations, DOE did not act arbitrarily in basing its decision on reasonable assumptions, when any errors could be corrected at a later time.

Second, Gulf asserts that the March 6 Order was issued in a manner violative of Gulf's due process rights, because no notice and opportunity to be heard preceded the Order. However, Gulf has not yet been deprived of any property. The March 6 Order did not effect a deprivation. Only the publication of the March Entitlements Notice may deprive Gulf of property, and even then, any deprivation will not be final, because of the clean-up mechanism DOE intends to adopt. Now, over two months after the March 6 Order, DOE has not yet taken any action to effect a deprivation of property; this has provided Gulf sufficient time to initiate administrative proceedings challenging the March 6 Order. Thus, Gulf has received notice, and is now being heard. It thus does not appear that the March 6 Order was issued in violation of Gulf's due process rights.

Third, Gulf argues that the March 6 Order was issued *sua sponte* by DOE, and that DOE lacks statutory or regulatory authority to so act. Gulf is incorrect. The March 6 Order was part of an ongoing statutorily authorized exception proceeding, initiated by the 341 Unit.

Because the court has found that Gulf has made an insufficient showing of either irreparable injury or likelihood of success on the merits,[3] the court need not now address the other "side of the coin," *Virginia Petro-*

---

**3.** The determination that Gulf has failed to show irreparable injury, and has failed to show a substantial likelihood of success on the merits of its claim that the DOE has acted beyond its statutory authority, strengthens another position taken by DOE in its opposition to Gulf's motion for a preliminary injunction. DOE argues that Interim Orders are only appealable upon the issuance of a final decision and order by the Office of Hearings and Appeals, under 10 C.F.R. § 205.69A(d). DOE further argues that the March 6 Order is a supplement to the December 31 Interim Order, and the March 6 Order is therefore only subject to review upon the issuance of a final decision and order. There being no final decision and order, DOE asserts that Gulf has failed to exhaust its administrative remedies. "In the absence of exceptional circumstances ... [plaintiffs are] not entitled to equitable relief because of [their]

*leum, supra,* 259 F.2d at 925, by inquiring into whether issuance of the injunction would substantially harm other parties interested in the proceedings. Nor need the court determine where the public interest lies. Gulf's motion will be denied.[4]

An appropriate Order accompanies this Memorandum Opinion.

failure to exhaust [their] administrative remedies." *Petraco-Valley Oil v. DOE,* 633 F.2d 184, 200 (Em.App.1980). In *Petraco-Valley,* the court appeared to endorse the exceptions to the doctrine of administrative remedies described in 5 Mezines, Stein & Gruff, *Administrative Law* § 49.02, at 49–7 to 49–29 (1979). Four exceptions are listed in that treatise, none of which apply to this matter. In the instant case, the agency can supply an adequate remedy, the agency action will not cause irreparable injury, the agency has not been shown to have clearly acted in excess of its statutory authority, and pursuit of an administrative remedy would not be futile.

4. On April 24, 1981, DOE wrote to Gulf, informing Gulf of the result of the Office of Hearings and Appeals "preliminary review of [Gulf's] Request for Modification of the March 6, 1981 Supplemental Order." That letter states, *inter alia,* "Our preliminary determination in this matter is that instead of modifying the March 6 Order, we should change the certification procedures in the December 31 Order by adopting the generally applicable recertification procedures. This change would result in a reduction in Gulf's revenues of $13.3 million." The letter continues, "we therefore propose to

require Gulf to purchase on the next Entitlements List $13,333,446 in additional entitlements." Finally, the letter states, "In order to provide Gulf with a full opportunity to respond to our preliminary determinations in this matter, we have scheduled a hearing for May 5, 1981. At that hearing Gulf and other interested parties will be permitted to make oral presentations concerning the issues raised in this letter."

After discussing the lack of any legal force carried by this letter, and lack of any relevance of this letter to the instant motion, Gulf asks that the court enjoin DOE from including this $13.3 million obligation in any Entitlements Notice, or enjoining DOE from enforcing this purchase obligation against Gulf. This the court will not do. As Gulf points out, this letter has no legal effect. At most, it is a notice of a proposed agency action, and of an opportunity to be heard before the agency takes the action. Furthermore, there is no indication that a final decision by DOE to include the obligation in the Entitlements Notice, if such a decision is made, would be arbitrary and capricious, beyond DOE's authority, or not supported by substantial evidence.