**AIR TRANSPORT ASSOCIATION OF AMERICA, INC., Plaintiff,**

**Air Line Pilots Association, International, Plaintiff–Intervenor,**

v.

**EXPORT–IMPORT BANK OF THE UNITED STATES, et al., Defendants.**

**Civil Action No. 11–2024 (JEB).**

United States District Court, District of Columbia.

Jan. 13, 2012.

---

Michael K. Kellogg, Andrew Stephen Oldham, W. Joss Nichols, Wan J. Kim, Kellogg, Huber, Hansen, Todd & Evans, Figel P.L.L.C., Washington, DC, for Plaintiff.

David Michael Glass, Department of Justice, Washington, DC, for Defendants.

Jonathan Asher Cohen, Robert Russell Bailey, Air Line Pilots Association, International, Washington, DC, Stephen B. Moldof, Cohen, Weiss and Simon, LLP, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

JAMES E. BOASBERG, District Judge.

This case presents a collision of interests between domestic airlines, which seek to avoid competing against subsidized foreign carriers, and domestic aircraft manufacturers, which desire those foreign carriers to buy U.S. planes rather than shopping overseas. Plaintiffs here are organizations representing the interests of certain U.S. airlines and airline pilots. Through this lawsuit and accompanying Motion for Preliminary Injunction, they seek to enjoin the Export–Import Bank of the United States from approving a guaranteed lender for loans it has already committed to a foreign airline, Air India, for the purchase of planes from a U.S. aircraft manufacturer, Boeing. Although the Bank raises serious questions about Plaintiffs' standing and the justiciability of this suit, the Court need not reach these issues. Because Plaintiffs have not demonstrated a likelihood that they will suffer irreparable harm during the pendency of the lawsuit in the absence of an injunction, the Court will deny their requested relief.

## I. Background

### A. *The Export–Import Bank Act*

The Export–Import Bank of the United States is an independent federal agency and corporation originally established by Executive Order in 1934. *See* 12 U.S.C. §§ 635(a)(1), 635a(a); Exec. Order 6581, 12 C.F.R. § 401 (Feb. 2, 1934), *reprinted as amended in* 12 U.S.C. § 635. In 1945, Congress enacted the Export–Import Bank Act (Bank Act), 79 Cong. Ch. 341, 59 Stat. 526 (1945), which, as amended and codified at 12 U.S.C. § 635 *et seq.*, constitutes the Bank's Charter. Among the Bank's functions are to issue "guarantees, insurance, and extension[s] of credit." 12 U.S.C. § 635(b)(1)(A). In doing so, the Bank seeks to "foster expansion of exports of manufactured goods, agricultural products, and other goods and services, thereby contributing to the promotion and maintenance of high levels of employment and real income, a commitment to reinvestment and job creation, and the increased development of the productive resources of the United States." *Id.* Loans and guarantees issued by the Bank carry the full faith and credit of the United States government. *Id.,* § 635k.

Before it authorizes a loan or guarantee, the Bank Act directs the Bank to consider both the financial wisdom of the loan or guarantee, as well as its impact on U.S. industry and employment. The Bank shall only make loans that, "in the judgment of the Board of Directors, offer reasonable assurance of repayment." *Id.,* § 635(b)(1)(B); *see also id.,* § 635j(a). "[I]n authorizing any loan or guarantee, the Board of Directors shall take into account any serious adverse effect of such loan or guarantee on the competitive posi-

tion of United States industry ... and shall give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports." *Id.,* § 635(b)(1)(B). The Bank Act identifies certain "limitation[s] on assistance which adversely affects the United States," and it provides that "[t]he Bank may not extend any direct credit or financial guarantee for establishing or expanding production of any commodity for export by any country other than the United States, if ... the Bank determines that ... the resulting production capacity is expected to compete with United States production of the same, similar, or competing commodity," or that "the extension of such credit or guarantee will cause substantial injury to United States producers of the same, similar, or competing commodity." *Id.,* §§ 635(e)(1)(A)(ii), 635(e)(1)(B). The extension of credit or a guarantee by the Bank causes "substantial injury if the amount of the capacity for production established, or the amount of the increase in such capacity expanded, by such credit or guarantee equals or exceeds 1 percent of the United States production." *Id.,* § 635(e)(4).

The Bank Act details certain procedures to reduce the adverse effects of loans and guarantees on industry and employment in the United States. *See id.,* § 635(e)(7). For example, if the Bank conducts a "detailed economic impact analysis or similar study" as part of its loan—or guarantee-approval process, it must publish notice of the intended study in the Federal Register and allow for a period of public comment, as well as seek the comments of specified government agencies. *Id.,* § 635(e)(7)(A)-(B). The Bank is required to "address [the] views of adversely affected persons" before "taking final action on an application for a loan or guarantee to which this section applies" by providing such persons' comments, in writing, to the Bank's Board of Directors. *Id.,* 635(e)(7)(C). Despite these procedural notice-and-comment requirements, the Bank Act makes clear that subchapter II of chapter 5 of Title 5 of the U.S.Code *(i.e.,* the APA's notice-and-comment provisions) does not apply to the Bank. *Id.,* § 635(e)(7)(E).

### B. *The Air India Commitments*

The Export–Import Bank has a long history of making loans and/or loan guarantees to support domestic aircraft manufacturing, including financing purchases of those aircraft by foreign airlines. *See* Opp. at 7, Exh. A (Declaration of Robert Morin, Vice President of Bank's Transportation Division, Dec. 16, 2011), ¶¶ 10, 22. These loan guarantees allow foreign airlines to obtain credit with a lower interest rate, which in turn provides them with an incentive to purchase their planes from Boeing, as opposed to from Boeing's chief competitor, France's Airbus. *See* Opp. at 8–9. As purchases of Airbus aircraft are frequently financed by various European export credit agencies, the Ex–Im Bank's loan guarantees help level the playing field for U.S. aircraft manufacturers. *Id.* In 2010, the Bank provided more than $11.5 billion in financing for purchases of U.S.-manufactured commercial aircraft, which represents the largest industry supported by the Bank. *See* Opp. at 7–8 (citing Morin Decl., ¶¶ 10, 22).

Air India is one such customer that has obtained preliminary and final commitments of Ex–Im Bank financing to support its purchase of U.S.-made aircraft from Boeing. A company seeking Bank financing may apply to the Bank's Board of Directors for approval of either a preliminary or final commitment. *See* Opp. at 9–10. Obtaining a preliminary commitment allows the purchaser to engage in long-term planning. *Id.* Preliminary commitments may be converted to final commit-

ments by another vote of the Board. *Id.* New commitments of more than $100 million require an extra step: the Bank may initially approve the commitment pending a 25–day period for Congressional review and comment, and only afterward finalize the commitment. 12 U.S.C. § 635(b)(3).

The Bank's Board awarded initial approval of the loan guarantees at the heart of the present case—preliminary commitments to Air India of almost $4.7 billion and to Air India Charters Ltd. of more than $300 million—on August 24, 2006. *See* Supplemental Declaration of Robert Morin, ¶ 4 (Jan. 9, 2012) (ECF No. 28). Simultaneously, the Board initially approved final commitments to Air India for more than $900 million and to Air India Charters Ltd. for more than $300 million. *Id.* On September 28, 2006, after the required period of time for Congressional review, the Board gave final approval to these preliminary and final commitments. *Id.* On four occasions since September 2006, the Board has converted portions of its preliminary commitments to Air India into final commitments. These partial conversions occurred on July 31, 2008; June 11, 2009; May 24, 2011; and, most recently, on September 30, 2011. *Id.,* ¶¶ 8–11. The September 30, 2011, transaction involved the approval of two final commitments in the amount of approximately $1.2 billion. *Id.,* ¶ 11. On this same date, the Bank also reauthorized the remainder of its 2006 preliminary commitment to Air India. *Id.,* ¶ 12.

The final commitments approved on September 30, 2011, along with the preliminary commitments reapproved that day, are intended to support Air India's purchase of Boeing 787 and 777–300ER aircraft. *See* ATA Compl., Exh. 1–D (Declaration of Daniel M. Kasper, Compass Lexecon, Oct. 24, 2011), ¶ 28. These are "widebody aircraft" suitable for "long-haul routes" such as nonstop international flights. *Id.* The Boeing 787 represents a new addition to Air India's fleet. *Id.*

### C. *The Current Action*

Plaintiff Air Transport Association of America, Inc. (ATA) is a trade organization, headquartered in Washington, D.C., that represents United States airlines. *See* ATA Compl., ¶ 13. ATA's member airlines include AirTran Airways; Alaska Airlines, Inc.; ASTAR Air Cargo, Inc.; Delta Air Lines, Inc.; Evergreen International Airlines, Inc.; Hawaiian Airlines; JetBlue Airways Corp.; Southwest Airlines Co.; U.S. Airways, Inc.; United Air Lines, Inc.; Continental Airlines, Inc.; American Airlines, Inc.; Atlas Air, Inc.; Federal Express Corp.; and United Parcel Service Co. *Id.,* ¶ 13 n. *. ATA "work[s] with its members in legal, political, and regulatory arenas to foster a business and regulatory environment that promotes a safe, secure, and financially successful U.S. airline industry." *Id.*

Plaintiff–Intervenor Air Line Pilots Association, International (ALPA) is an unincorporated labor organization, also based in Washington, D.C., that represents "approximately 47,000 pilots employed by 28 United States commercial airlines." ALPA Compl., ¶ 11. ALPA's members include pilots that work for airlines that provide "significant international services," including Alaska, Continental, Delta, FedEx, Hawaiian, and United. *Id.*

ATA filed its Complaint in this case on behalf of nine of its member airlines on November 16, 2011. *See* ATA Compl., ¶ 13 n.*. Six of ATA's members declined to join the suit: United, Continental, American, Atlas Air, FedEx, and United Parcel Service. *Id.*

In its Complaint, ATA asserts nine claims against the Export–Import Bank and senior Bank officials under the Bank

Act and the APA.[1] In Counts I and II, Plaintiff alleges that Defendants violated the Bank Act, 12 U.S.C. §§ 635a–2 and 635(b)(1)(B), and therefore acted arbitrarily and capriciously under the APA, § 706(2)(A) and (C)-(D), by "approving the Air India Commitments without considering the extent to which they are likely to have an adverse effect on the domestic airline industry" and on "domestic employment." ATA Compl., ¶¶ 127–28, 130–31. Count III asserts the Bank violated the Bank Act and the APA by "approving the Air India Commitments without considering whether Air India is able to offer reasonable assurances of repayment." Id., ¶¶ 133–34 (citing 12 U.S.C. §§ 635(b)(1)(B), 635j). Count IV alleges that the Bank unlawfully "approved the Air India Commitments without considering whether they cause a substantial injury to the domestic airline industry." Id., ¶¶ 136–37 (citing 12 U.S.C. § 635(e)(1), (4)). Count V claims that the Bank violated the Bank Act by approving the Air India Commitments "without providing notice, soliciting comment, and providing a reasoned explanation for its decision." Id., ¶¶ 139–40 (citing 12 U.S.C. § 635(e)(7)). Counts VI and VII state that the Ex–Im Bank "has a policy of approving loan guarantees for foreign airlines without considering the extent to which they are likely to have an adverse effect on the domestic airline industry" and on "domestic employment." Id., ¶¶ 142–43, 145–46 (citing 12 U.S.C. §§ 635(b)(1)(B), 635a–2). Count VIII asserts that the Bank has an arbitrary and capricious "policy of approving loan guarantees for foreign airlines without considering whether they cause a substantial injury to the domestic airline industry." Id., ¶¶ 148–49 (citing 12 U.S.C. § 635(e)(1), (4)). Count IX claims the Bank has an arbitrary and capricious "policy of approving loan guarantees for foreign airlines without providing notice, soliciting comment, and providing a reasoned explanation for its decision." Id., ¶¶ 151–52 (citing 12 U.S.C. § 635(e)(7)). Finally, in Count X, ATA asserts the foregoing violations warrant the issuance of a temporary restraining order and a preliminary injunction. Id., ¶¶ 154–58.

As relief, ATA seeks a "declaration that [D]efendants violated and are in violation of the Bank Act and the APA for failing to comply with the Bank Act," id. at 30, as well as injunctive relief including:

(i) an order that the approved Air India Commitments are unlawful for failure to comply with the Bank Act and the APA;

(ii) an order prohibiting the Ex–Im Bank from issuing guarantees on its Air India Commitments;

(iii) an order requiring the defendants to prepare domestic-industry studies in support of their Air India Commitments;

(iv) an order requiring the defendants to prepare domestic-employment studies in support of their Air India Commitments;

(v) an order requiring the defendants to prepare substantial-injury studies in support of their Air India Commitments;

(vi) an order prohibiting the defendants from issuing guarantees on its Air India Commitments to the extent that those commitments will cause substantial injury to U.S. companies;

(vii) an order requiring the defendants to provide public notice and comment regarding their domestic-industry, domestic-employment, and substantial-in-

---

1. The individual Defendants are Fred P. Hochberg, in his official capacity as Chairman and President of the Bank; Wanda Felton, in her official capacity as First Vice President and Vice Chair of the Bank; and Sean Mulvaney, in his official capacity as a member of the Bank's Board of Directors.

jury studies in support of their Air India Commitments; [and]

(viii) an order requiring the defendants to ensure that Air India is able to offer reasonable assurances of repayment for the Air India Commitments[.]

*Id.* at 30–31.

Along with its Complaint, ATA filed a Motion for Temporary Restraining Order and Motion for Preliminary Injunction. ATA explained that it needed to act expeditiously because of the impending delivery of an aircraft from Boeing to Air India. *See* Mot. at 3. On November 16, 2011, Chief Judge Royce Lamberth denied Plaintiff's Motion for Temporary Restraining Order on the ground that, "[i]n absence of the administrative record relied upon by the defendant Export–Import Bank in approving the loan guarantees at issue, the Court cannot satisfy itself that plaintiff has shown a [sufficient] likelihood of success of the merits." *Air Transport Association of America, Inc. v. Export–Import Bank of the United States*, No. 11–2024 (D.D.C. Nov. 16, 2011) (order denying temporary restraining order). Chief Judge Lamberth ordered Defendants to file the administrative record with the Court, which Defendants did on November 29, 2011. *Id.;* ECF No. 18.

Meanwhile, on November 22, 2011, Air Line Pilots Association, International filed its Motion to Intervene, which this Court granted. *See* ECF No. 15. ALPA filed its eight-count Complaint similarly asserting violations of the Bank Act and the APA on November 29, 2011.

This Court subsequently held several conference calls with all parties to establish a schedule upon which all could agree. Given the representations that one of the planes may be delivered on January 16, 2012, the parties sought a briefing and hearing schedule that would yield a decision before that date. The Court obliged, and, accordingly, Defendants filed their Opposition to Plaintiff's Motion on December 16, 2011, and on December 30, 2011, ATA and ALPA filed Replies. The Court heard argument on the Motion on January 6, 2012, and issues this Opinion one week later.

## II. Legal Standard

A preliminary injunction "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 374. Before the Supreme Court's decision in *Winter*, courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another. *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C.Cir.1999). This Circuit, however, has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm. *See Sherley v. Sebelius*, 644 F.3d 388, 391 (D.C.Cir.2011); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C.Cir.2009).

Whether sliding-scale analysis still exists or not, courts in our Circuit have held that "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." *CityFed Financial Corp. v. OTS*, 58 F.3d 738, 747 (D.C.Cir. 1995), *cited in Dodd v. Fleming*, 223

F.Supp.2d 15, 20 (D.D.C.2002); *see also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (*per curiam*) ("We believe that analysis of the [irreparable harm] factor disposes of these motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").

### III. Analysis

#### A. *Standing and Justiciability*

The Bank initially argues that the Court need not reach the merits of Plaintiffs' Motion because two preliminary matters stand in the way. First, it contends that Plaintiffs lack standing to bring this suit. *See* Opp. at 13. Second, it maintains that the Bank's decision to guarantee loans to Air India is not reviewable under either the Bank Act or the APA because the former provides no private right of action, and the latter bars review since the Bank's loan-application decisions are committed to the agency's discretion. *See id.* at 17–20; *see also* 5 U.S.C. § 701(a)(2) (APA's judicial review provisions do not apply where "agency action is committed to agency discretion by law").

Standing and justiciability are admittedly threshold questions that must be addressed before the merits of a case. *See Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 942–43 (D.C.Cir.2012) (standing is "threshold jurisdictional question") (internal quotation omitted); *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C.Cir.2011) (justiciability is threshold question). Indeed, here they involve complex issues that may well be the subject of future dispositive motions. Because there is a simpler resolution of Plaintiffs' Motion—namely, on the ground of irreparable harm—the Court need not wade into this thicket now. Instead, it will assume standing and justiciability for the purpose of the current Opinion only. *See Dorsey v.*

*American Express Co.*, 680 F.Supp.2d 250, 253 n. 4 (D.D.C.2010) ("For the purpose of the current motion, the Court will assume that Mr. Dorsey has standing. Because it finds that his claims have no merit, it need not resolve the standing question."); *Little v. Fenty*, No. 09–2308, 2009 WL 4981535, at *1 (D.D.C.2009) (denying motion for preliminary injunction and noting that "the Court shall assume for the purposes of this Memorandum Opinion only that Plaintiff has standing to bring this motion").

#### B. *Preliminary Injunction Factors*

##### 1. *Irreparable Harm*

■ Given that Plaintiffs must demonstrate irreparable harm to prevail here, the Court starts with that analysis. "The irreparable injury requirement erects a very high bar for a movant." *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F.Supp.2d 162, 168 (D.D.C.2008) (citing *Varicon Int'l v. OPM*, 934 F.Supp. 440, 447 (D.D.C.1996)). "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" *Hi–Tech Pharmacal Co. v. FDA*, 587 F.Supp.2d 1, 11 (D.D.C.2008) (quoting *Gulf Oil Corp. v. Dept. of Energy*, 514 F.Supp. 1019, 1026 (D.D.C.1981)). The "alleged injury must be certain, great, actual, and imminent." *Hi–Tech Pharmacal Co.*, 587 F.Supp.2d at 11 (citing *Wisconsin Gas*, 758 F.2d at 674). Courts will need not grant injunctive relief "against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas*, 758 F.2d at 674. The "movant must demonstrate that the injury is of such 'imminence' that there is a clear and present need for equitable relief to prevent irreparable harm." *Judicial Watch, Inc. v. Dep't of Homeland Security*, 514 F.Supp.2d 7, 10 (D.D.C.2007) (quoting *Wisconsin Gas*, 758 F.2d at 674).

### a. Nature of Harm

Plaintiffs claim their member airlines and pilots will suffer irreparable harm as a result of the Bank's loan guarantees to Air India if this Court does not award injunctive relief. *See* Mot. 11 at 25; ALPA Reply at 2. Specifically, ATA asserts that "if Air India places just one new Bank-backed aircraft into service pending resolution of this suit, U.S. airlines will be forced to cut routes, cut capacity on other routes, and lay off employees." Mot. at 30. Plaintiffs allege that one ATA member, Delta, suffered just this type of injury in 2008 when it was forced to cut its New York–to–Mumbai service after Air India used Ex–Im Bank financing to increase its passenger capacity along that same route. *Id.* at 31. Its members are likely, ATA asserts, to suffer this same type of harm in the future should Air India successfully obtain even one additional Bank-financed plane. *Id.* ATA further asserts that the Bank's guarantees will give Air India a "competitive advantage in the aircraft financing market" that will enable that airline to expand its international routes, thereby harming "U.S. airlines' market share." *Id.* At the hearing on this Motion, ATA further described the likely harm to U.S. airlines as a "loss of business and loss of goodwill." Hearing Tr. at 20.

■ The first hurdle Plaintiffs face is that the harms they identify are economic in nature and therefore not generally irreparable. The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms. *See National Ass'n of Mortgage Brokers v. Board of Governors of the Federal Reserve System,* 773 F.Supp.2d 151, 182 (D.D.C.2011) (regulation that "will cause many mortgage brokers to lose their jobs or close their business" identified as "purely economic injury"); *Berman v. DePetrillo,* No. 97–70, 1997 WL 148638, at *2 (D.D.C. Mar. 20, 1997) ("loss of market"

and "loss of business opportunity" identified as "purely economic injury"); *Clipper Cruise Line, Inc. v. U.S.,* 855 F.Supp. 1, 4 (D.D.C.1994) (identifying loss of "profits" and "goodwill" as economic loss). It is well settled in this Circuit that "economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas,* 758 F.2d at 674. This is because economic injuries are generally in fact reparable with monetary damages in the ordinary course of litigation. *See id.*

■ ATA argues, however, that *any* damages in a suit against a defendant with sovereign immunity are irreparable *per se.* Mot. at 26 (citing, from this District, *Smoking Everywhere, Inc. v. FDA,* 680 F.Supp.2d 62, 77 n. 19 (D.D.C.2010); *Feinerman v. Bernardi,* 558 F.Supp.2d 36, 51 (D.D.C.2008); *Nalco Co. v. EPA,* 786 F.Supp.2d 177, 188 (D.D.C.2011)). This argument stretches too far. As this Court held in *Woodstream Corp. v. Jackson,* No. 11–867 (D.D.C. June 3, 2011) (order denying preliminary injunction), not only is such a rule not the law of this Circuit, but it would also effectively eliminate the irreparable harm requirement. Any movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard. The wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity. This premise is aptly discussed in *Gulf Oil,* where the district court held:

> [T]here is some appeal to the proposition that any damage, however slight, which cannot be made whole at a later time [because of sovereign immunity], should justify injunctive relief. However, some concept of magnitude of injury is implicit in the *Virginia Petroleum [Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958) ] standards, under which,

if plaintiff shows irreparable injury and likelihood of success on the merits, the court must then weigh against this the injury to defendant, and the public interest. While perhaps leading to some confusion, the courts appear to treat some threshold level of this balancing, *sub silentio*, under the irreparable injury prong of the analysis. The result of this balancing process appears to be that the injury must be more than simply irretrievable, it must also be serious in terms of its effect on the plaintiff.

514 F.Supp. at 1026. This Court's holdings in *Woodstream* and today are consistent with other recent decisions of courts in this District. *See National Shooting Sports Foundation, Inc. v. Jones*, No. 11–1401, 2011 WL 3875241, at *3 n. 5 (D.D.C. Sept. 2, 2011) ("Taken out of context, the district court's statement [in *Smoking Everywhere* ] that 'any loss of income' that cannot be recovered is irreparable is overbroad. The Circuit clearly requires that harm be both certain and great.") (citing *Wisconsin Gas*, 758 F.2d at 674); *Coalition for Common Sense*, 576 F.Supp.2d at 170 n. 3 (D.D.C.2008) (rejecting argument that financial losses rendered unrecoverable by sovereign immunity constituted irreparable injury in that case).

■ Economic harm may constitute irreparable injury, however, when "the loss threatens the very existence of the movant's business." *Wisconsin Gas*, 758 F.2d at 674; *see also Coalition for Common Sense*, 576 F.Supp.2d at 170 n. 3 (citing cases) ("unrecoverable financial loss can constitute irreparable injury under some circumstances"). Where a movant makes "a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits," *Mylan Pharms., Inc. v. Shalala*, 81 F.Supp.2d 30, 43 (D.D.C.2000), or demonstrates that the loss would "cause extreme hardship to the business, or even threaten destruction of the business," *Gulf*

*Oil*, 514 F.Supp. at 1025, irreparable harm may be established. For economic harm to constitute irreparable injury, however, Plaintiffs must "adequately describe and quantify the level of harm its members face." *National Ass'n of Mortgage Brokers*, 773 F.Supp.2d at 181 (D.D.C.2011). As explained below, Plaintiffs have not made such a showing here.

#### b. Uncertainty of Serious Harm

■ As a preliminary matter, the Court finds that ATA must establish a likelihood that irreparable harm will be suffered by one or more of its member airlines *who have not opted out* of this lawsuit. It cannot be fairly said that, for purposes of this case, ATA represents those of its member airlines who have affirmatively declined to participate. Harms to United or American, for example, are thus not properly considered here. As a result, none of the airlines participating in this lawsuit currently offers a direct flight between the U.S. and India. Opp. at 36–37. While Delta flew such a route from 2006 to 2008, *see* Mot. at 13–14, it can only offer that it hopes to do so in the future. *See* Hearing Tr. at 18.

Plaintiffs nevertheless argue that the Ex–Im Bank's practice of guaranteeing loans to foreign carriers like Air India for the purchase of Boeing planes has injured domestic airlines. In support of this thesis, ATA submitted declarations from both financial experts familiar with the aviation industry and top executives from Delta Airlines. These declarations contain testimony that the Bank's loan guarantees to foreign airlines have caused U.S. carriers to suffer competitive disadvantages in terms of capital expenditures and maintenance costs, and allowed foreign airlines to increase international flight capacity in competition with U.S. airlines. *See, inter alia*, ATA Compl., Exh. 1–B (Declaration of Richard H. Anderson, CEO of Delta

Airlines, Oct. 31, 2011) (on harm to U.S. airlines caused by Bank's support to foreign carriers); Exh. 1–C (Declaration of Paul A. Jacobson, Senior Vice President of Finance and Treasurer for Delta, Oct. 31, 2011) (on aircraft-purchase financing); Exh. 1–D (Declaration of Daniel M. Kasper, Compass Lexecon, Oct. 24, 2011) (on harm to U.S. airlines caused by Bank's support of foreign carriers); Exh. 1–E (Declaration of John P. Heimlich, Vice President and Chief Economist of ATA, Oct. 31, 2011) (on airline-industry economics).

In order to obtain a preliminary injunction in this case, however, Plaintiffs must prove "that the harm has occurred in the past *and is likely to occur again*" in the immediate future as a result of the action they seek to enjoin. *Wisconsin Gas,* 758 F.2d at 674 (emphasis added). Defendants have represented to the Court that Boeing is scheduled to deliver one plane to Air India in January 2012 and one additional plane in March 2012. *See* Hearing Tr. at 50. Any injury to Plaintiffs that may be caused by the delivery of one or two planes to Air India is, at this stage, wholly speculative.

ATA argues that it is reasonable to assume Air India will use its newly acquired widebody aircraft to increase its offering of international routes. *See* Kasper Decl. at D–19–D–20, ¶ 28. Plaintiffs concede, however, that Air India has not announced the routes on which it will use its new planes, including whether it will increase capacity on routes for which Delta or other participating ATA members offer competing service. *See* ATA Reply, Exh. A (Supplemental Declaration of Daniel M. Kasper, Dec. 30, 2011), ¶ 5. Indeed, there is no showing

even of how long it will take Air India to deploy these planes from the date of delivery. *See* Hrg. Tr. at 56 (may take months for Air India to deploy new plane on international routes). Given that no participating ATA member offers nonstop U.S.-India service, deployment on this route would clearly not represent direct competition. Even if Air India used the new plane on a *segment* of a U.S.-India route, Plaintiffs' own charts show direct competition will not necessarily occur. *See* Supp. Kasper Decl. at 6, Exh. 3; 8, Exh. 4. (These charts also fail to distinguish lost revenue by participating ATA members from U.S. carriers generally.)

Even were the Court to accept Plaintiffs' argument that planes are fungible goods— meaning an increase in Air India's fleet is likely to have a direct effect on U.S. airlines no matter how the planes are used— Plaintiffs have not demonstrated how an increase in foreign-carrier capacity would affect U.S. airlines' ability to sell out their own flights on international routes. *See* ATA Reply at 4. ATA's consultant, Daniel M. Kasper of Compass Lexecon, estimates that Air India's acquisition of one Boeing 787 with Bank financing, put into service on one daily round-trip route between the U.S. and India, would result in a passenger capacity increase representing at least *19%* of total U.S. carrier capacity serving India. *See* Kasper Decl. at D–21, ¶ 30 (emphasis in original); *see also* D–24, ¶ 35. He does not conclude what effect, if any, this increase in *capacity* would have on the *revenues*—or any other quantifiable measure of business success—of the ATA members participating in this suit, none of whom presently flies nonstop between the U.S. and India.[2] In other words, Plaintiffs

---

**2.** Mr. Kasper opines that "[a]s of June 2011, U.S. carriers competed with Ex–Im Bank-supported carriers on 125 non-stop overlapping routes that accounted for nearly $6 billion in U.S. carrier revenues." Kasper Decl. at D–4, ¶ 6. While Appendix C to his

Declaration identifies the airlines flying each of these 125 routes, his declaration does not identify a percentage of the $6 billion in revenues attributable to airlines participating in this lawsuit. His conclusion, furthermore, is

have not shown that this new competition will cause them to lose revenue or lay off employees, including pilots, and have thus not "adequately describe[d] and quantif[ied] the level of harm [their] members [will] face" upon the delivery of additional Bank-financed planes to Air India. *National Ass'n of Mortgage Brokers*, 773 F.Supp.2d at 181.

Even if injury to Delta, ATA's other members, or ALPA was certain, Plaintiffs have not established that the magnitude of this future economic harm will be significant enough to qualify as irreparable for the purpose of this Court's preliminary-injunction analysis. Mr. Kasper's report indicates that in 2010, Delta received approximately $2.1 billion from 37 nonstop routes on which it competed with Bank-backed foreign carriers. Kasper Decl. at D–11, Exh. 5. By contrast, in total, Delta serves more than 160 million customers per year and employs over 80,000 workers, including pilots. *See* Opp. at 37, Ex. F (Delta Air Lines Stats & Facts, http://news.delta.com/index.php?s=18 (last visited Dec. 13, 2011)). It flies to 341 destinations—101 of them international—in 61 countries. *Id.* Delta's total annual revenue for 2010 was $31.8 billion. *Id.* Even if Delta had to cut every nonstop route on which it currently competes with Bank-backed foreign carriers—an extreme hypothetical that neither party suggests could occur—Mr. Kasper's calculations suggest the lost revenue would represent less than 7% of Delta's business, a figure that hardly seems ruinous.

In addition, even if the delivery of one or two planes in early 2012 would likely cause Delta (or other Plaintiffs) to suffer irreparable financial harm, Plaintiffs have not established with any certainty that this is a harm the Court could prevent with the issuance of a preliminary injunction. In

order to warrant injunctive relief, "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wisconsin Gas*, 758 F.2d at 674. Here Plaintiffs argue their injury will be triggered by delivery of the next plane financed by the Bank's Air India commitments. *See* Mot. at 30. As all parties agree, however, this Court lacks the power to enjoin Boeing, a non-party to this action, from delivering planes under its agreement with Air India. *See* Hearing Tr. at 11, 49. Plaintiffs instead ask the Court to issue an order "prohibiting the Ex–Im Bank from issuing guarantees on its Air India Commitments." ATA Compl. at 30. As ATA clarified at the hearing on this Motion, it wants the Court to enjoin the Bank from approving a guaranteed lender for Air India's loans and signing the loan guarantee itself. Hearing Tr. at 10–11. In light of the evidence presented by Defendants at the hearing, it is not clear that an injunction preventing the Bank from taking these final steps would in fact prevent Boeing from making delivery of its planes or Air India from putting them into service. *See id.* at 46–49.

### c. Delay

■ Finally, Plaintiffs' delay in seeking relief from the Bank's allegedly illegal approval of the Air India commitments weighs against a finding of irreparable harm. *See, e.g., Newdow v. Bush*, 355 F.Supp.2d 265, 292 (D.D.C.2005) ("unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm"); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C.Cir.1975) (Announcing, "Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in

---

phrased in terms of past revenue *earned*, rather than *lost*, thereby making it impossible for the Court to draw any conclusions about future harm.

seeking one" and finding delay of 44 days "inexcusable"); *Mylan Pharms.*, 81 F.Supp.2d at 44 (delay of two months "militates against a finding of irreparable harm").

The parties in this case vigorously dispute when and what Plaintiffs knew or should have known about the Air India commitments. Plaintiffs assert they first learned that the Bank had converted the loan guarantees about which they now complain into final commitments following the Board's September 30, 2011, vote. *See* ATA Compl., ¶ 31. To the extent Plaintiffs were aware that the Bank had previously approved loan guarantees to Air India to purchase Boeing aircraft, they contend they had no way of knowing that the September 2011 final commitments were part of the same transactions preliminarily approved in 2006. *See* ATA Reply at 28–29. Finally, Plaintiffs argued at the hearing that they could not have known that the loan guarantees approved by the Bank as preliminary commitments in 2006, and as final commitments in 2011, were for the purchase of Boeing's new 787 aircraft. *See* Hearing Tr. at 30–31. The 787 is a plane that Air India does not currently possess and that, by virtue of new technology, will purportedly give Air India an unprecedented competitive advantage in the market for transatlantic flights. *See id.;* Kasper Decl. at D–19–D–20, ¶ 28. This new information, Plaintiffs now assert, prompted them to file suit.

Plaintiffs' explanations cannot excuse their delay. The Bank's Board approved the preliminary commitments for the loan guarantees at issue here in 2006—over *five years* ago—and converted portions of those preliminary commitments into final commitments on July 31, 2008; June 11, 2009; and May 24, 2011, before approving the most recent final commitment on September 30, 2011. Morin Supp. Decl., ¶¶ 8–11. Indeed, 38 planes have already been delivered. *See* Hrg. Tr. at 53. While the Bank's press releases regarding final commitments to Air India are perhaps not as elucidating as Defendants might now wish—particularly in terms of the types of planes Air India would purchase with its guaranteed loans—they reveal that Plaintiffs should have known about the Bank's relevant commitments years before seeking to enjoin them. *See id.,* Exh. 1A (collecting Ex–Im Bank Board meeting minutes and press releases) (ECF No. 28–1).

For example, public minutes from the Bank Board's July 31, 2008, meeting reveal that the Board approved an Air India request for a final commitment to purchase aircraft from Boeing. *See* ECF No. 28–1 at 28. The transaction is identified as "Conversion No. 1," suggesting at that time it was the first in what would be a series of such approvals. *Id.* The Bank's press release following the approval announces the Bank's extension of $548.6 million in loan guarantees to support Air India's purchase of Boeing aircraft, but suggests more significant financial investment, quoting an Air India representative regarding the "Ex-im Bank's contribution in partnering with Air India in our project to acquire *88* state-of-the-art aircraft from The Boeing Company." *Id.* at 30 (emphasis added). Similarly, the public minutes from the Bank Board's June 11, 2009, meeting describe "Conversion No. 2," another final commitment to Air India for a loan guarantee to purchase aircraft from Boeing. *See id.* at 31–32. The press release announcing the approval reveals both the amount of the transaction—$1.1 billion—and describes it as the "Ex–Im Bank's continuing support for the acquisition plan that Air India has undertaken to rejuvenate its fleet" and "the *second partial* conversions of two Ex–Im Bank preliminary commitments to final commitments." *See id.* at 34 (emphasis added).

These 2009 conversions occurred *after* ATA member Delta cut its nonstop U.S.–to–India route in October 2008, the harm Plaintiffs allege resulted from the Bank's prior approval of a portion of the Air India commitments and the harm ATA argues is likely to occur again as a result of the September 30, 2011, final commitments. *See* Mot. at 31; Hearing Tr. at 21 (describing harm ATA fears as "the potential loss of a route"). Yet, as Plaintiffs sought no legal or equitable relief in response to the Bank's 2008 or 2009 approvals, it is hard for them now to maintain they only recently understood the significance of the effect of these loans on their business. *See* Hearing Tr. at 14–15.

Neither is the Court persuaded that Plaintiffs' learning that the Air India commitments include loan guarantees to support the purchase of 787s was game-changing information that only recently revealed an impending harm. All along Plaintiffs have argued that the harm they seek to enjoin here is that suffered by Delta in 2008—namely, that Air India received Bank financing that allowed it to acquire new planes with lower maintenance costs more cheaply, increase its international capacity, and unfairly compete head-to-head with U.S. airlines. Those new planes were not 787s. *See* Kasper Decl. at D–19–D–20, ¶ 28. While Air India's use of Bank financing to acquire the state-of-the-art 787 may increase the magnitude of U.S. airlines' competitive disadvantage, the nature of the harm is the same, and it is something Plaintiffs have known about for years.

Finally, despite learning of the September 30, 2011, final commitment of approximately $1.3 billion to Air India on the date of its approval, *see* ATA Compl., ¶ 31, Plaintiffs took no legal action at all until November 1, 2011, when they sent letters to the Bank expressing their concerns. *Id.*, ¶¶ 33–34. ATA then did not file its Complaint or seek injunctive relief until November 16, 2011. While Plaintiffs' delay is far from the sole basis upon which the Court denies their Motion, this inaction, coupled with the economic and speculative nature of Plaintiffs' alleged impending harm, dictates against the granting of injunctive relief.

### 2. Balance of Equities and Public Interest

■ Given the lack of showing of irreparable harm, denial of Plaintiffs' Motion would be proper without consideration of the other preliminary injunction factors. *See CityFed Financial Corp. v. OTS*, 58 F.3d at 747. The Court nevertheless finds a brief discussion of the balance of the equities and the public interest implicated by Plaintiffs' request for injunctive relief to be appropriate. These factors, too, weigh strongly in favor of denying Plaintiffs' Motion. The Supreme Court has directed "courts of equity [to] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24, 129 S.Ct. 365 (citation omitted). To the extent the Ex–Im Bank succeeds in carrying out its purpose of fostering the export of U.S. goods and services and supporting employment of U.S. workers, the Bank's interest and the public interest are aligned.

Robert Morin's declaration supports the Bank's position that the issuance of a preliminary injunction in this case could have significant consequences for the Bank as well as all U.S. manufacturers that export goods with the aid of Bank financing. If the Court were to enjoin the Bank from taking the final act of signing the loan guarantee for Air India's purchase of planes from Boeing, the Bank would be prohibited from fulfilling these already-approved final commitments, with potential long-term consequences for the Bank's

reputation on the world stage. Mr. Morin explains:

> A determination that a Bank Final Commitment is not, in fact, final, would likely send an alarming message to the market that a Bank Final Commitment is inherently unreliable because an outside, unrelated party can disrupt the Final Commitment in order to prevent potential competition from its rival airlines or other competitors. Such a risk adds uncertainty to the market in general and to the preparations being undertaken by the parties. Minimizing uncertainty is a key component of all business planning—especially in transactions as large as the sale of a Boeing aircraft. Foreign purchasers would be more likely to avoid doing business with the Bank as a means of avoiding such uncertainty. This would result in a marked decrease of transactions in both the Bank aircraft program and others. This is a particular risk considering that foreign purchasers could turn to competing Airbus aircraft that receive more certain support from the European export credit agencies.

Morin Decl., ¶ 46. In other words, the issuance of a preliminary injunction in this case has the potential to harm the Bank's reputation as a reliable source of financing, which may prompt potential foreign buyers of U.S. goods to seek foreign sellers that can provide financing from the export credit agencies of other nations—which, in turn, could result in a decrease in demand for exported U.S. goods. *See* Opp. at 40–41.

Even were Plaintiffs able to show with certainty that the delivery of one plane in accordance with the Air India commitments would result in the loss of an international route and corresponding jobs for Delta or another of ATA's participating member airlines, the Court finds that this harm would be far outweighed by the harm an injunction would likely cause the Bank and U.S. manufacturers such as Boeing that rely on Bank-backed exports.

A preliminary injunction is thus not warranted.

## IV. Conclusion

The Court, therefore, ORDERS that:

1) Plaintiffs' Motion for a Preliminary Injunction is DENIED; and

2) The parties shall appear for a status hearing on January 20, 2012, at 2:00 p.m. in Courtroom 19.

**SO ORDERED.**